[No. 43334. En Banc. August 7, 1975.]

NEW TACOMA PARKING CORPORATION, *Respondent*, v. KEN JOHNSTON et al, *Appellants*, THE CITY OF TACOMA, *Respondent*.

*Ronald L. Hendry* and *Don Herron, Prosecuting Attorneys,* and *Michael B. Hansen, Deputy,* for appellants.

*Gordon, Thomas, Honeywell, Malanca, Peterson, O'Hern & Johnson,* by *E. M. Murray* and *L. R. Ghilarducci, Jr.,* and *Robert R. Hamilton* and *Don L. Hogaboam,* for respondent.

HUNTER, J.—The plaintiff (respondent), the New Tacoma Parking Corporation, hereinafter referred to as the corporation, filed a writ of prohibition against the defendants (appellants), the Pierce County Assessor, the Pierce County Board of Equalization, and the Pierce County Treasurer, to enjoin the levying and collecting of any ad valorem taxes. The defendants, upon the granting of this writ by the trial court, have appealed.

In 1962, the City of Tacoma authorized the filing of a survey and planning application with the United States Housing and Home Finance Agency, intending to establish a redevelopment program for the downtown business area. In August of 1963, the Tacoma City Council formally adopted a resolution which approved the New Tacoma Urban Renewal Project. The plan called for the utilization of the City's urban renewal powers granted under RCW 35.81, and, pursuant thereto, it provided for the acquisition of land by condemnation. At this time the City entered into a temporary loan and capital grant contract with the Department of Housing and Urban Development, according to which loan funds were made available for the purchasing of sites, demolition of buildings and other site improvement costs, which would be repaid from proceeds of the land disposition, federal capital grants and local cash grants. Under the federal statutes, as amended, the federal government would provide three-fourths of the project cost and the City would be responsible for the remaining one-fourth contribution to be used for the urban renewal project, in-

cluding the construction of two public parking garages. A plan was devised in 1965 through which a private nonprofit corporation would be formed to assist in the acquisition, financing, construction and operation of the parking facilities.

Pursuant to this plan an agreement was entered into between the City and the corporation, which basically called for the City to acquire the site through condemnation proceedings utilizing temporary loan funds from the federal government. The City would then call for bids from those interested in the redevelopment project. If the corporation received the bid, it would immediately give the property back to the City who, in return, would lease it back to the corporation. The articles of incorporation clearly indicate that the sole purpose for forming the corporation was to assist the City in qualifying for the receipt of the above described federal funds. The corporation did receive the bid, as was expected, and the agreement went into effect.

The corporation purchased the site for $320,000 having obtained approximately $2,815,000 through the sale of revenue bonds, which were purchased by several local banks. The Bank of California acted as trustee for the bondholders. These bonds were secured solely by the revenue produced in the operation of the parking facilities and the City incurred absolutely no liability, the banks having assumed primary responsibility and risk of providing necessary funds to insure that the project was carried through to completion. Furthermore, the corporation did not stand to make any profit, since any revenues produced above that necessary to meet the bond obligation went directly to the City.

. Under the terms of the lease, the City retained fee simple title to all of the parking areas of the two garage structures. The lease further provided that all of the corporation's assets would automatically be transferred to the City upon the expiration of the lease term, which was set at 35 years, or earlier if the bonds were retired prior to the

expiration of the lease term. In return, the City would accept possession free and clear of any outstanding obligations of the corporation or the interests of the bondholders. The corporation was charged with the management and operation of the garages. However, the City had to approve the disbursements of all monies. Furthermore, all parking rates and changes pertaining thereto, as well as all regulations and restrictions affecting the operation of the garages, were fixed, established and maintained by the City. Finally, the corporation was required to submit annual budgets to the City for its approval.

In 1971, the Pierce County Assessor valued the corporation's leasehold interest in the two garages at $1,549,120 and $1,143,332, and revalued them at $1,544,290 and $1,139,910 for 1972. Based on these assessed values, the Pierce County Treasurer issued personal property tax statements in the amount of $66,624.42 for the 1972 tax year, and $68,326.31 for the 1973 tax year. In August of 1973, the corporation applied for a writ of prohibition to prevent the Pierce County Treasurer from collecting these taxes. In the alternative, the corporation applied for a writ of mandamus to require the Pierce County Assessor to correct his assessments. The trial court limited itself to the issue of whether the corporation was responsible for the payment of these taxes.

The sole issue presented to this court for consideration is whether the leasehold interest held by the corporation is exempt from the ad valorem tax under the provisions of Const. art. 7, § 1 (amendment 14), which states in part:

> Property of the United States and of the state, counties, school districts and other municipal corporations . . . shall be exempt from taxation.

The corporation contends that the property in question, for all practical purposes, belongs *totally* to the City of Tacoma, and therefore its leasehold interest is sheltered by the above constitutional provision. We disagree.

█ RCW 84.04.080 provides in part:

· "Personal property" for the purposes of taxation, shall be held and construed to embrace and include, without especially defining and enumerating it . . . all leases of real property and leasehold interests therein for a term less than the life of the holder; all improvements upon lands the fee of which is still vested . . . in the state of Washington; . . .

One of the primary purposes of this statute is to facilitate "the collection of taxes on leasehold interests in publicly owned, tax-exempt, land." *Clark-Kunzl Co. v. Williams*, 78 Wn.2d 59, 62, 469 P.2d 874 (1970). Therefore, ordinarily, a bare leasehold in publicly owned property held by a private individual or corporation is taxable regardless of the tax-exempt status of the holder in fee. *Pier 67, Inc. v. King County*, 78 Wn.2d 48, 469 P.2d 902 (1970); *Moeller v. Gormley*, 44 Wash. 465, 87 P. 507 (1906).

In attempting to escape this principal of taxation, the corporation has pointed out numerous aspects of the relationship between itself and the City contained in the agreement and lease, which burden the corporation with vast responsibilities without bestowing a reciprocal opportunity for pecuniary remuneration. As heretofore stated, the City retained virtually total control over the operation of the parking facilities, including, yet not limited to, the right to approve all regulations, rate changes, monetary disbursements, and yearly budgets. The corporation was permitted to contract with a third party, who would be in charge of actually operating the facilities, yet this choice was also subject to the City's approval. Furthermore, the corporation was responsible for carrying out the agreed upon managerial policies and for depositing the daily receipts with the Bank of California. Finally, and most important, neither the corporation nor any of its officers were entitled to a salary or to share in any profits generated by the parking facilities.

█ In relying on these facets of its relationship with the City, the corporation has failed to properly distinguish those factors which affect their taxable status from those

factors which inherently affect valuation. In *Pier 67, Inc. v. King County, supra,* we enunciated the proper standard of valuation and assessment to be applied to leasehold interests in tax-exempt property. We stated on page 57:

> *The market value of a leasehold* is to be measured by considering both benefits to be garnered from the use of the property over the term of the lease and the burdens placed upon it. *Burdens on the leasehold are restrictions which limit its use.* These burdens may arise from zoning ordinances or other legal limits on land use or *may be restrictions imposed by the terms of the lease itself.*

(Italics ours.) It would seem quite evident that those factors relied upon by the corporation to exempt its leasehold from a taxable status are relevant only as to the issue of valuation. Therefore, while the burdens and restrictions placed on the leasehold limiting its use do not affect its status as a taxable entity, they may reduce the market value of the leasehold. *Clark-Kunzl Co. v. Williams, supra; cf. Bitney v. Morgan,* 84 Wn.2d 9, 523 P.2d 929 (1974). No matter how great a reduction in value may be, the purpose and effect of RCW 84.04.080 remains the same: the imposition of a potential tax liability intended to attach to a leasehold interest in public tax-exempt property held by a private individual or corporation.

We reverse the trial court's judgment holding that the New Tacoma Parking Corporation was exempt from ad valorem taxes. Since the trial court bifurcated the issue of exemption from that of valuation, we remand this cause for a determination of the latter issue.

STAFFORD, C.J., and FINLEY, ROSELLINI, HAMILTON, WRIGHT, UTTER, BRACHTENBACH, and HOROWITZ, JJ., concur.

Petition for rehearing denied October 27, 1975.